UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x.

CHRISTIAN KILLORAN, on behalf of his son, A.K.,      Index #: 19-cv-6663 (JS) (SIL)
CHRISTIAN KILLORAN and TERRIE KILLORAN,              Amended Complaint

        Plaintiffs,

        v.

WESTHAMPTON BEACH SCHOOL DISTRICT,
MICHAEL RADDAY, as Superintendent, SUZANNE
M. MENSCH, JAMES HULME, JOYCE C. DONNESON,
GEORGE R. KAST JR, and HALSEY C. STEVENS, as
Board of Education Members,

        Defendants.
-------------------------------------------------------------x.

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  APR 2 2 2021  ★

LONG ISLAND OFFICE

*The plaintiff, Christian Killoran, herein submits this verified "Amended Complaint", on*

*behalf of his son, A.K., as well as himself and his wife, Terrie Killoran.*

1.     This "Amended Complaint" is submitted in response to the "Memorandum and Order",

issued by the Honorable Judge Joanna Seybert on March 25, 2021, which dismissed the

plaintiffs' previously filed "42 U.S.C. 1983 (1983) equal protection action" – without prejudice.

2.     In accord with the foregoing, this "Amended Complaint" is submitted for the purposes

of reconciling the "substantive pleading deficiencies", cited by Judge Seybert in her referenced

decision, relative to the plaintiffs' "1983 equal protection - class of one claim".

3.     At this juncture, as the Court is familiar with the plaintiffs' "at-large" legal battle against

the defendants, a recitation of the comprehensive background history of the plaintiffs' claim

remains unnecessary.

4.     In any event, prior to setting forth the factual basis' necessary to substantiate the

plaintiffs' claim, the plaintiffs are compelled to comment upon one particular aspect of Judge

Seybert's referenced decision, which appears to be either factually incorrect, or alternatively may have been tendered in oversight of the relevant administrative record.

5.      Specifically, in this regard, on page 5 of her referenced decision, Judge Seybert referenced that the Impartial Hearing Officer (IHO) Nancy Lederman held that both the plaintiffs and the defendant district were found to be "equally culpable" for the educational deprivation suffered by the plaintiff, A.K., attendant to the defendant district's violations of the Individuals With Disabilities Education Act (IDEA).

6.      In this regard, the plaintiffs are respectfully compelled to submit that while Judge Seybert's statement may be true, a further analysis of the administrative record would reveal that the plaintiff, A.K.'s, parents were exonerated from all culpability by the State Review Officer (SRO), Sarah Harrington, who subsequently overturned that particular portion of IHO Lederman's decision. (See: SRO Harrington Decision, No. 17-015, dated: 03/23/2017).

7.      As a result of the foregoing, and to the extent that Judge Seybert felt that such matter remained pertinent to her analysis, the record should be clear that only the defendant district has been held liable for the educational deprivation suffered by the plaintiff, A.K.

8.      In any event, the plaintiffs respectfully submit that their "equal protection" claim, as set forth herein, is grounded in the protections afforded by the United States Constitution's Fourteenth Amendment's "Equal Protection Clause", which provides that the Government must treat "all similarly situated people alike". Harlen Assocs. v. Inc. Vill. Of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) - (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).

9.      As an extension of the foregoing, the plaintiffs further submit that their claim is grounded in the protections afforded by the Equal Protection Clause, extended to "individuals,

2

who allege no specific class membership" - known as "class of one claims". <u>Vill. of Willowbrook</u>

<u>v. Olech</u>, 528 U.S. 562, 564 (2000).

10.     Towards this end, the plaintiffs argue that for purposes of analyzing a "1983 equal

protection – class of one claim", the plaintiff, A.K., profiles as someone, who, despite profiling

as being "similarly situated and/or prima facially identical" to certain students who graduated

from his elementary school, was nevertheless treated unequally by the defendants, by virtue of

the defendants denying his enrollment.

11.     Further, the plaintiffs argue that for purposes of analyzing a "1983 equal protection –

class of one claim", the plaintiff, A.K., profiles as someone, who, despite profiling as being

"similarly situated and/or prima facially identical" to certain other enrolled students within the

defendant district, was nevertheless treated unequally, by virtue of the defendants "pre-

determining" his educational placement within the context of a convened Committee on

Special Education (CSE) held in October 2016.

12.     Additionally, the plaintiffs argue that for purposes of analyzing a "1983 equal protection

– class of one claim", the plaintiff, A.K., profiles as someone, who despite profiling as being

"similarly situated and/or prima facially identical" to certain other "alternately assessed special

education students", who are presently receiving an education within the defendant district at

the post-elementary level, is nevertheless being treated unequally, by virtue of the defendant

district choosing to apply its special education resources towards educating these certain

"alternately assessed special education students", but not the plaintiff, A.K.

13.     Tangentially, the plaintiffs respectfully submit that no rational person could regard the

circumstances of the plaintiff, to differ from those of any "comparator", to a degree that would

3

justify the differential treatment exercised by the defendants. <u>Ruston v. Town Bd. Of Town of Skaneateles</u>, 610 F.3d 55, 59-60 (2nd Cir. 2010), cert. denied, 562 U.S. 1108 (2010) (quoting <u>Clubside, Inc. v. Valentin</u>, 468 F.3d 144, 159 (2nd Cir. 2006) at 159.

14.     Further, the plaintiffs respectfully submit that no rational person could conclude that the defendants' actions have been exercised pursuant to any legitimate government policy, or upon any reasonable mistake. <u>Id.</u>

*Point I: It remains uncontroverted that the plaintiff, A.K., was treated differently from all of the other graduates of the Remsenburg-Speonk Elementary School, relevant to his rights of "enrollment"*

15.     When the plaintiff, A.K., graduated from his elementary school, namely the Remsenburg-Speonk Elementary School, he had the unequivocal choice to either enroll in the defendant school district or the Eastport South Manor School District.

16.     The plaintiff, A.K.'s, enrollment rights were clearly established within the education contract vested between the Remsenburg-Speonk School District and the defendant district.

17.     Further, the plaintiff, A.K.'s, enrollment rights were clearly memorialized within 8 NYCRR 200.2(f), which holds that the defendant district, as the appropriate "receiving district", was legally obligated to honor the plaintiff, A.K.'s, enrollment, by virtue of convening a Committee of Special Education (CSE).

18.     Additionally, the plaintiff, A.K.'s, enrollment rights were clearly evidenced within the historical course of dealing forged between the Remsenburg-Speonk Elementary School District and the defendant district, wherein such history reveals that no person, other than the plaintiff, A.K., had ever had his/her enrollment request denied, predicated upon grounds of a disability.

19.     IHO Lederman verified the plaintiff's enrollment rights, and the defendant district's violation thereof, within her decision.

20.     Heretofore, Judge Seybert has bound the defendants to IHO Lederman's findings and decision. (See: Judge Seybert Decision, dated: 09/27/19, at 33, Index #: 17-cv-0866 (JS) (SIL)).

21.     As a consequence of the defendants' refusal to enroll the plaintiff, A.K., it remains uncontroverted that he was denied access to the defendant district's educational infrastructure, as well as all of the services and benefits offered by the defendant district.

22.     Further, as a consequence of the defendants' refusal to enroll the plaintiff, A.K., it remains uncontroverted that he suffered an educational deprivation.

23.     In fact, IHO Lederman verified the foregoing realities.

24.     To date, the defendant district's decision to deny the plaintiff, A.K.'s, enrollment has been found to be a violation of the IDEA. (See: IHO Lederman Decision, dated: 01/26/2017).

25.     Additionally, to date, the defendant district's decision to deny the plaintiff, A.K.'s enrollment, remains proffered as a corollary violation of the Americans With Disabilities Act (ADA) and Section 504 of the Rehabilitative Act of 1973 (504), within the context of a related action. (See: Index #: 17-cv-0866).

Point IA: The plaintiff, A.K. profiles as being "similar situate and/or prima-facially identical" to his "typical" Remsenburg-Speonk Elementary School graduating cohorts

26.     For purposes of analyzing the efficacy of the plaintiffs' "1983 equal protection – class of one claim", the plaintiffs respectfully submit that the plaintiff, A.K., profiles as being "similarly situate and/or prima-facially identical" to those "typical" students who graduated from the plaintiff, A.K.'s, elementary school.

5

27.     Towards this end, the plaintiffs submit that there are many similarities exhibited between the plaintiff, A.K., and his "typical" elementary school graduating cohorts that support this proposition.

28.     First, similar to his "typical" elementary school graduating cohorts, the plaintiff A.K. was also an elementary school graduating student.

29.     Second, similar to his "typical" elementary school graduating cohorts, the plaintiff, A.K., was the same grade-level age.

30.     Third, similar to his "typical" elementary school graduating cohorts, the plaintiff, A.K.'s, rights to enroll within the defendant district was codified within an educational contract vested between the defendant district and the Remsenburg-Speonk Elementary School.

31.     In fact, the plaintiffs respectfully submit that the only discernible difference between the plaintiff, A.K., and his "typical" elementary school graduating cohorts, was that the plaintiff, A.K., was disabled.

32.     Nevertheless, despite sharing these similar characteristics with his "typical" elementary school graduating cohorts, only the plaintiff, A.K., was denied his right to enroll within the defendant district.

33.     The plaintiff respectfully submits that the process of enrollment is not a function related to whether or not a student has a disability, but rather profiles as a dynamic that should be a simple administrative and ministerial function.

34.     IHO Lederman verified the plaintiff, A.K.'s, right to enrollment, irrespective of his disability.

6

35.     In light of the foregoing, the plaintiff respectfully submits that the fact that the plaintiff, A.K., was disabled, should not be utilized as a factor to "distinguish" or "deny" the otherwise inherent "similarities" existing between himself and his "typical" elementary school graduating cohorts.

36.     As such, the plaintiffs respectfully submit that, other than evidencing a disability – which the plaintiffs respectfully submit should not be utilized as a basis to meaningfully "distinguish" the plaintiff, A.K. (at least with respect to his rights of enrollment) from his fellow elementary school graduating cohorts, the plaintiff, A.K. otherwise profiles as being "similarly situate and/or prima facially identical" to his elementary school graduating cohorts.[1]

37.     IHO Lederman held that the defendant district not only denied the plaintiff, A.K.'s, enrollment, but did so in a "summary and predetermined" fashion.

Point IB: The plaintiff, A.K. profiled as being particularly "similarly situate and/or prima-facially identical" to his "non-typical" Remsenburg-Speonk Elementary School cohorts

38.     The plaintiff, A.K., not only profiled as being "similarly situate and/or prima-facially identical" to his "typical" elementary school graduating cohorts, but he also profiled as being "particularly similarly situate and/or prima-facially identical" to certain other "special education" elementary school graduating cohorts, who, unlike the plaintiff, A.K., had been afforded enrollment within the defendant district.

39.     By way of illumination, the plaintiff notes to the Court that the plaintiff, A.K., profiles as an "alternately assessed special education student".

---

[1] Relative to the plaintiff, A.K.'s, rights to "enrollment", the plaintiff, A.K.'s, disability should not be utilized as a factor to distinguish himself from his peers. Indeed, the process of enrollment has nothing to do with whether a student has a disability or not, as the defendant district was legally bound to enroll the plaintiff, A.K., and afford him access to a lawfully convened CSE, irrespective of his disability.

7

40.     In summary, an "alternately assessed special education student" is someone who, based upon his/her disability, is not held accountable to achieve the same "performance assessments" as "typical" students.

41.     Notably, "alternate assessed special education students" share certain uniform and/or universal characteristics, towards which the plaintiff herein argues establishes such students as being "particularly similarly situate and/or prima-facially identical" for purposes of a "1983 equal protection – class of one claim" analysis.

42.     Towards this end, the plaintiff cites the following characteristics and/or similarities that are "shared" between himself and other "alternately assessed special education students".

43.     First, all "alternately assessed special education students" are entitled to the development of an Individualized Educational Plan (IEP).

44.     Second, all "alternately assessed special education students" do not need to pass "typical" standardized assessments.

45.     Third, all "alternately assessed special education students" are entitled to receive related services and educational accommodations.

46.     Fourth, all "alternately assessed special education students" share similar IQ proficiencies.

47.     Fifth, all "alternately assessed special education students" are entitled to receive modified curriculum.

48.     Sixth, all "alternately assessed special education students" are entitled to receive behavioral modification plans, if necessary.

49.     Seventh, all "alternately assessed special education students" are entitled to receive transitional planning and services.

50.     Eighth, all "alternately assessed special education students" are entitled to be educated within the least restrictive learning environment (LRE).

51.     Ninth, all "alternately assessed special education students" are entitled to have their respective educational placements explored within the available "continuum of placement alternatives", as profiled within 8 NYCRR 200.

52.     Tenth, all "alternately assessed special education students" must be considered to be "severely disabled", and thus must meet strict eligibility criteria in order to be classified as such.[2]

53.     Eleventh, all "alternately assessed special education students" are deemed "disabled people" and thus are collectively afforded the protections endowed within the IDEA, ADA, and 504.

54.     Twelfth, all "alternately assessed special education students" are designated to pursue an alternate graduating credential, other than a High School Diploma, such as a "skills and achievement graduating credential", or a "career and development graduating credential".

55.     In light of the foregoing, the plaintiffs argue that the plaintiff, A.K., profiled as someone who was "particularly similarly situate and/or prima facially identical" to those other

---

[2] In order to be classified as an "alternately assessed student", New York State holds that you must be "severely disabled". Towards this end, New York State defines a "severely disabled student" as being a student who has limited cognitive abilities combined with behavioral and/or physical limitations and who requires highly specialized education and/or social, psychological, and medical services in order to maximize his/her full potential for useful and meaningful participation in society and for self-fulfillment. Students with severe disabilities may experience severe speech, language, and/or perceptual-cognitive impairments and challenging behaviors that interfere with learning and socialization opportunities. These students may also have extremely fragile physiological conditions and may require personal care, physical/verbal supports, and assistive technology devices. 8 NYCRR 100.1(t)(2)(iv).

9

"alternately assessed special education students" who graduated from not only the

Remsenburg-Speonk Elementary School, but also from any of the other "sending districts" as

well.[3]

56.     The plaintiff A.K. was the only student to ever had his enrollment denied predicated

upon a disability.

57.     The foregoing fact was verified by IHO Lederman.

58.     The plaintiff, A.K, argues that the only discernable difference between himself and these

other "alternately assessed special education students", whose respective enrollment

applications were processed by the defendant district, was that the plaintiff, A.K., had voiced

his intention to challenge the defendant district's historic and discriminatory and reflexive

policy of "outsourcing" the post-enrollment, post-elementary education of every single

"alternately assessed special education student" that has ever come before it.

59.     The plaintiffs note to the Court that the defendant district's practice and/or policy of

"outsourcing" is not a matter of conjecture or speculation, but rather is a sordid reality that has

been acknowledged and admitted to by the defendant district itself, via the depositional

testimony of the defendant Superintendent, as well as the defendant Board of Education

Members, Suzanne Mensch and James Hulme.[4]

60.     In fact, IHO Lederman acknowledged the defendant district's sordid history.

---

[3] The school districts of East Moriches, Remsenburg-Speonk, Quogue and East Quogue all send their elementary school graduates to the defendant district for education, grades 7-12. At the time of the plaintiff's enrollment application, Freedom of Information Law (FOIL) requests revealed that the defendant district was "outsourcing" approximately 25 students, following their respective enrollments.

[4] Depositional testimony garnered from the plaintiffs' pending ADA and 504 claims against the defendant district reveal the defendant district's sordid history. Further, so does the District Census Data.

61.     Further, in addition, to the "shared" characteristics evidenced between the plaintiff, A.K., and the other "alternately assessed special education students", who graduated from any of the "sending district" elementary schools, the plaintiffs submit that the plaintiff, A.K., shared an even further "particularized similarity" with at least one of these students.

62.     In regard to the foregoing, the plaintiff, A.K., notes to the Court that he shares a particular medical diagnosis with a certain Remsenburg-Speonk elementary school graduate, named "H.R".

63.     Both A.K. and H.R. profile as people born with Down Syndrome.

64.     The plaintiffs note to the Court that people with Down Syndrome evidence a number of universal and/or "shared" physical characteristics, and therefore by extension, profile as being "particularly similarly situate".

65.     An example of these "shared" physical characteristics include an extra copy of chromosome 21, low muscle tone, small stature, upward slant of the eyes, single deep crease across center of the palm, deep grove between first and second toes, wide short hands and fingers, white spots on colored portion of pupil, increased risk of autism, gland/hormonal problems, hearing loss, vision and heart abnormalities.

66.     Further, towards this end, the plaintiffs note to the Court that people with Down Syndrome also share certain universal and/or "shared" cognitive characteristics, and therefore by extension, profile as people being "particularly similarly situate".

67.     An example of these "shared" cognitive traits include cognitive impairment, short attention span, poor judgment, impulsive behavior, slow learning, delayed language and delayed speech.

68.     In light of the foregoing, and in relevance to a "1983 equal protection – class of one claim", the plaintiffs argue that the plaintiff, A.K., certainly profiled as being "particularly similarly situate" to the referenced student known as H.R.

69.     In fact, the plaintiffs respectfully submit that a comparative analysis of the respective IEP's of H.R. and A.K. will reveal a striking degree of similarity shared between such students, as would a tangential analysis of their respective scores garnered from a host of academic, psychological, and physical evaluations.[5]

70.     In light of the foregoing, the plaintiffs respectfully submit that the plaintiff, A.K., profiles as being "particularly similarly situate and/or prima facially identical" not only to those "typical" students who graduated from elementary school, but in an even greater degree and capacity to those "alternately assessed special education students" graduating from elementary school, and finally, in an even greater capacity to the student known as H.R.

*Point II: It remains uncontroverted that the plaintiff, A.K., was treated differently from all other graduates of the Remsenburg-Speonk Elementary School even following his "enrollment" within the defendant district*

Point IIA: The defendant district treated the plaintiff unequally within the context of its convened Committee on Special Education (CSE)

71.     The plaintiff re-asserts the statements set forth with in paragraphs 1-67.

72.     As the Court is aware, the defendant district belatedly enrolled the plaintiff, A.K., following the cross-examination of the defendant district Superintendent, amidst the context of a certain administrative due process hearing held in 2016.

---

[5] The plaintiffs are personally knowledgeable regarding the contents of H.R.'s IEP, as they are friends with H.R.'s parents. Further, the plaintiff submits that an analysis of the evaluative reports known as the "Stanford Binet Intelligence Scale", the "Woodcock Johnson IV Test of Achievement" and the "Vineland Adaptive Behavior Scale", would reveal striking similarities between A.K. and H.R.

73.     Following such enrollment, the defendant district was compelled to convene a CSE, wherein presumably, the CSE would then have been charged with meaningfully analyzing the plaintiff, A.K., as a student, for purposes of developing an appropriate IEP, and further deciding upon an appropriate educational placement for the plaintiff, A.K.

74.     The referenced CSE convened in October 2016, but nevertheless, simply continued its "predetermination" of the plaintiff, A.K.

75.     IHO Lederman validated the foregoing reality.

76.     In light of the foregoing, the plaintiffs respectfully submit that the defendants' treated the plaintiff, A.K., unequally, in respect to all of those students who did not have their educational placements "predetermined" by the defendant district's CSE.

77.     In this regard, the plaintiffs herein repeat all of the similarities previously cited between the plaintiff A.K. and any "non-typical alternately assessed special education student".

Point IIB: The defendant district treated the plaintiff unequally following his enrollment by choosing to apply its special education resources towards the education of certain "alternately assessed special education students", but not the plaintiff, A.K.

78.     The plaintiff re-asserts the statements set forth within paragraph 1 – 75.

79.     The record will reveal that only following the commencement of the plaintiffs' claims challenging the defendant district's historic and discriminatory practice and/or policy of "outsourcing" the post-elementary educational placement of every single post-elementary aged "alternately assessed special education student" that had ever come before it, did the defendant district "suddenly" and "mysteriously" summon the ability to educate "alternately assessed special education students" at the post-elementary level.

80.     In this regard, following the commencement of the plaintiffs' claims, the defendant district began educating "alternately assessed special education students" at the Middle School Level.[6]

81.     Towards this end, the defendant district constituted an "alternately assessed special education class" comprised of 2-3 students.[7]

82.     Despite evidencing all of the special education resources and capacities to educate "alternately assessed special education students" at the post-elementary level, the defendant district nevertheless continued to refuse to do so for the plaintiff, A.K.

83.     As acknowledged by Judge Seybert in her referenced "Memoranda and Order", this reality was so alarming to IHO Leah Murphy, that IHO Murphy proactively issued an "Interim Order", which therein compelled the defendant district to file for an educational variance that would have, at least theoretically, permitted the plaintiff, A.K., from being included within such class, despite an existing three-year age disparity regulatory prohibition.

84.     Notably, within her referenced decision, Judge Seybert seemingly utilized such "age disparity" as being the reason why the plaintiff, A.K. was held not to be "similarly situate" to such other "alternately assessed special education students".

85.     The plaintiffs respectfully submit however, that any "age disparity" evidenced between such "comparator" students, should not be held to be a relevant factor with respect to the Court's analysis of the plaintiffs' "1983 equal protection – class of one claim".

---

[6] Only following the plaintiffs' claim challenging the defendant district's history of "outsourcing" did the defendant district suddenly begin educating "alternately assessed special education students" at the post-elementary level – coincidence?

[7] The present day class is composed of 3-4 students.

86.     Indeed, the plaintiffs respectfully submit that this is so because "age" is not a relevant factor in determining whether a school district is legally obligated to treat students in a non-discriminatory fashion, nor is "age" a relevant factor in determining whether a school district is legally obligated to provide students with a free and appropriate education (FAPE), nor is "age" a relevant factor in determining whether a school district is legally obligated to treat students equally, pursuant to the 14th Amendment of the United States Constitution.

87.     Moreover, the plaintiffs submit that "age" should be discarded as a relevant factor within the context of analyzing the plaintiffs' claim, specifically because the plaintiff, A.K., is not arguing for his inclusion within the "alternately assessed Middle School special education class" established by the defendant district.[8]

88.     In fact, the plaintiff respectfully submits that he is simply arguing for the defendants to be legally beholden to apply their special education resources to the plaintiff, A.K., in the same manner as applied to those "alternately assessed special education students" younger than him.

89.     Again, upon reflection of the defendant district's existing "alternately assessed special education class", the plaintiffs respectfully submit that it remains self-evident that the defendant district is capable educating "alternately assessed special education students" at the post-elementary level.[9]

---

[8] In light of this fact, it remains irrelevant that the plaintiff, A.K., is more than 3 years older than the next oldest "alternately assessed special education student", specifically because the plaintiff, A.K., is not seeking to be included within any Middle School class.

[9] Notably, the plaintiffs are unaware of any public school district, other than the defendant school district, that is not educating a single "alternately assessed special education student" at the High School Level, and certainly no public school district that, heretofore, profiled a similar history of "outsourcing" every single post-elementary aged "alternately assessed special education student" that had ever come before it.

90.     In logical extension of the foregoing, the plaintiffs respectfully submit that it should also remain self-evident that the defendant district is perfectly capable of educating the plaintiff, A.K.

91.     In fact, the defendant district has never been capable of citing what "special education resource" it lacks towards satisfactorily addressing the plaintiff, A.K.'s, unique and individualized educational needs.[10]

92.     In any event, the plaintiff, A.K., respectfully notes to the Court that in order for him to be appropriately educated by the defendant district, he need not be included within the defendant district's "Middle School alternately assessed special education class", but rather may be appropriately educated within a number of alternative educational formats, including education within a general education class with the support of a special education co-teacher, or placement within a special class, such as 15:1:1, 12:1:1 or 8:1:1, or a hybrid format.

93.     In light of the foregoing, the plaintiffs respectfully submit that the "relevant" facts attendant to an appropriate "1983 equal protection – class of one action", should relate only to the relevant "educational similarities" profiled between such students, as opposed to utilizing any age disparity as a basis to unilaterally and/or dispositively discredit an argument that such students do not otherwise profile as being "similarly situate and/or prima facially identical".[11]

---

[10] Throughout numerous administrative hearings and now depositions, the defendant district has never been able to explain what "special education resource" it actually lacks, that would prevent its ability to satisfactorily educate the plaintiff, A.K.

[11] The plaintiffs respectfully submit that the defendants have the burden of establishing that the "comparators" are different to a degree that would justify the defendants' unequal treatment. Ruston v. Town Bd. Of Town of Skaneateles, 610 F.3d 55, 59-60 (2nd Cir. 2010), cert. denied, 562 U.S. 1108 (2010) (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2nd Cir. 2006) at 159.

94.     And in this regard, the plaintiff submits that the "educational similarities" profiled

between the plaintiff, A.K., and those "alternately assessed special education students"

currently receiving an education within the defendant district's "alternately assessed special

education class", remain remarkably similar.

95.     Towards this end, the plaintiff repeats all of the similarities inherently evident between

"alternately assessed special education students", as well as those similarities inherently

evident between people born with Down Syndrome.

96.     In fact, the plaintiff notes to the Court that the referenced "alternately assessed special

education class", which is now comprised of approximately four students, now includes at least

three students – known as K.M., K.P. and J.H, who are also diagnosed with Down Syndrome,

just like the plaintiff, A.K.[12]

97.     In light of the foregoing, the plaintiffs submit that it remains self-evident that the

defendant district is entirely capable of educating the plaintiff, A.K., but simply refuses to do so.

98.     In order to further illuminate the "similarities" and "prima facial identical profiles"

shared between the plaintiff A.K. and those students within the defendant district's "alternately

assessed special education class", the plaintiff would ironically direct the Court's attention to

the referenced "variance application". (See: Variance Application, affixed hereto as "P-1").[13]

---

[12] Since the filing of the variance, the defendant district's existing "alternately assessed special education class" has evolved. In fact, for this upcoming year, it will be held at the High School and not the Middle School. Further, the class is now composed of 3 students who have Down Syndrome, just like the plaintiff, A.K. Further, at least 1 of the students is 15 years of age, and thus requires "transitional embeddings", just like the plaintiff, A.K. Finally, the class is situated as a "12:1:1 special class", just like the current educational placement recommendation assessed to the plaintiff, A.K.

[13] The plaintiffs utilize the word "ironically" because the variance application was used as a potential means to include the plaintiff, A.K., within the defendant district's "then contemplated" "alternately assessed special education class". Again however, the plaintiff is not arguing for inclusion within such class, but rather simply to mandate that the defendant district apply its special education resources towards addressing his educational needs in the same manner as applied to those students within the "alternately assessed special education class".

99.     In this regard, the plaintiffs respectfully submit that such "variance application" remains highly illustrative of the high degree of similarity profiled between the plaintiff, A.K., and the students within the defendant district's existing "alternately assessed special education class".

100.    Towards this end, the plaintiffs respectfully submit that such "variance application" profiles how the plaintiff A.K. shares essentially a "prima-facially identical student profile", other than profiling an age disparity, with those students within the defendant district's existing "alternately assessed special education class".

101.    Specifically, in this regard, an analysis of the variance application reveals that the plaintiff, A.K., shares numerous similar characteristics with the students within such class.

102.    First, an analysis of the variance application reveals that all of the students are "alternately assessed", just like the plaintiff, A.K. .

103.    Second, an analysis of the variance application reveals that all of the students require related services, just like the plaintiff, A.K.

104.    Third, an analysis of the variance application reveals that all of the students require an aide, just like the plaintiff, A.K.

105.    Fourth, an analysis of the variance application reveals that all of the students are working towards achieving a graduating "skills and achievement commencement credential", just like the plaintiff, A.K.

106.    Fifth, although the variance application reveals that the class would not include the need for transitional "embeddings" required for a student over 15 years of age, the plaintiffs

---

Indeed, towards this end, there a number of alternate placement opportunities that would enable the defendant district to educate the plaintiff, A.K., and the defendant district has never been able to articulate a single "special education resource" that it lacks, in order to do so.

note to the Court that that at least 3 years have past since this "variance application" was drafted, and that now, least one of the three students within such class is now over 15 years old, and thus now, does in fact require "transitional embeddings", just like the plaintiff, A.K.[14]

107.   Sixth, an analysis of the variance application reveals that all of the students are utilizing curriculum that is focused on the NYS learning standards, as well as upon functional skill-driven academics in reading, writing, and math, along with a focus upon developing the social skills and activities of functional daily living, based upon the individual student's individualized abilities, needs and preferences, just like the plaintiff, A.K.

108.   Seventh, an analysis of the variance application reveals that all of the students are working upon mastering "foundational" and/or "pre-curser" skills based in reading, writing, mathematics, speech/language, study skills, academic needs, social development, physical needs and management needs, just like the plaintiff, A.K.

109.   Based upon the foregoing, the plaintiff respectfully submits that the plaintiff, A.K., profiles as being strikingly similar and is essentially "prima facially identical" to the "alternately assessed special education students" currently being educated within the defendant district.[15]

---

[14] This variance application was formulated in 2018 – three years ago. Now, at least 1 of the students therein is over 15 and thus does in fact require "transitional embeddings".

[15] All of the students in the defendant district's presently comprised "alternately assessed special education class" rank in the similar IQ percentile as the plaintiff, A.K. Additionally, all of the students have remarkably similar IEPs, and rank comparably on all evaluative testing methodologies, including the NYS Alternate Assessment, as well as the Stanford Binet Intelligence Scales, the Woodcok Johnson IV Tests of Achievement, and the Vineland Adaptive Behavior Scales. In fact, the most telling aspect of the inherent similarity and prima facie identicalness of the students is that they have all been recommended for a special class setting in a 12:1:1 format – which self-evidently profiles that the students are similarly situate and prima facially identical.

110.    In fact, the plaintiffs note to the Court how the "variance application" was seemingly denied only upon the basis of the existing "age disparity" exhibited between the students, as opposed to any substantive disparity regarding the educational profiles of the students.

111.    And again, in any event, the plaintiff respectfully submits that any "age disparity" should not be held relevant within the context of the Court's analysis, particularly because the plaintiff, A.K., is not requesting inclusion within the defendant district's referenced "alternately assessed special education class".

112.    Indeed, the plaintiffs are simply arguing that the defendant district should be legally beholden to apply its special education resources in the same and/or equal manner to the plaintiff, A.K., as it is doing for those "alternately assessed special education students" younger than him.

113.    The plaintiffs note to the Court that the plaintiff, A.K.'s, education may be satisfactorily addressed within any number of alternate formats, including inclusion within a general education class – via the use of a co-special education teacher, or within a special class, such as a 15:1:1, 12:1:1, 8:1:1 or a hybrid format.

114.    In light of the foregoing, the plaintiffs submit that the fact that the variance application was denied, should remain entirely irrelevant to the Court's analysis, but that the striking similarities profiled between the plaintiff, A.K., and the "alternately assessed special education students" within such class, remains extremely telling.

115.    In any event, the plaintiffs again direct the Court's attention to the similarities shared between the relevant "comparators" regarding their respective learning characteristics and learning needs, attendant to aspects of reading, writing, mathematics, speech/language, study

skills, academic needs, social development, social needs, physical levels, physical needs, management needs, basic cognitive skills, daily living skills, and medical diagnosis.

116.    Further, the plaintiff submits that a comparative analysis between the plaintiff, A.K.'s, IEP and these students' respective IEPs, will further illuminate such striking similarities.[16]

117.    In fact, the plaintiff submits that the only discernible difference between the "comparators" is their respective ages, towards which the plaintiffs respectfully submit should not be considered a relevant factor, particularly because the plaintiff, A.K., is not arguing for inclusion within such "alternately assessed special education class".

118.    The plaintiffs note to the Court that the defendant district has never been able to cite a single reason for its alleged inability to educate the plaintiff, A.K., other than to allege that no other similarly aged student is being educated within the district – a reason that profiles as being not only perverse, but more importantly, is not recognized as a legitimate reason to defy the doctrine of "least restrictive environment", as enshrined within the IDEA.[17]

119.    And finally, profiling as perhaps the most illuminating and self-evidentiary expression that the plaintiff, A.K., is "similarly situated and/or "prima facially identical" to those students within the defendant district's existing "alternately assessed special education class", is the fact that all of the students (including the plaintiff, A.K.) have been recommended into a 12:1:1

---

[16] The defendant district has refused to comply with the plaintiffs' FOIL requests in this regard, even with appropriate redactions.

[17] The reason this alleged reason is "perverse" is because the defendant district itself remains responsible for the cited infirmity. Indeed, absent the defendant district's historic and discriminatory practice and/or policy of "outsourcing", there would be an abundance of "alternately assessed special education students" being educated within the defendant district. Again, at the time of the plaintiffs' initial court filings, the District Census Data revealed that over 25 students were being "outsourced". In any event, a professed lack of similar students is not a recognized educationally bona-fide reason to deny the plaintiff, A.K., with an education.

educational placement setting, which self-evidently showcases how the students' needs and

abilities are essentially the same.[18]

*Point III: Any cited difference between the plaintiff, A.K., and the "similarly situated" cohorts*
*cited herein, should be treated as being irrelevant towards the plaintiffs' "1983 equal protection*
*– class of one claim"*

120.    In order to contest a "1983 equal protection class of one claim", the plaintiffs

respectfully submit that the defendants must be able to "justify" the differential treatment

exercised by the government.

Point IIIA: There is no justification for the defendants' "pre-enrollment" unequal treatment of
the plaintiff, A.K.

121.    In this case, the defendants cannot "justify" their conduct relevant to their "pre-

enrollment" unequal treatment of the plaintiff, A.K.

122.    In this regard, the plaintiffs note to the Court how IHO Lederman held that defendant

district "summarily dismissed" and "predetermined" the plaintiff, A.K.'s, enrollment.

123.    Again, in this regard, Judge Seybert bound the defendant district to IHO Lederman's

findings.

124.    In any event, for purposes of further illustrating the deplorable nature of the defendant

district's conduct, the plaintiffs note to the Court how the defendants conduct defied the

---

[18] A "special class" simply refers to an intensified "teacher to student ratio" and nothing more. In "special
education", classes may either be "15:1" or "12:1" or "8:1", which means that the number of students in such
classes may not exceed "15", "12" or "8" respectively. Notably, there is no minimum number of students that are
required to constitute a "special class". In any event, based upon need, students are assigned to a particular "class
ratio". In this case, the plaintiffs submit that it remains highly illuminating that all of the "alternately assessed
special education students" that are presently receiving an education within the defendant district, at the post-
elementary level, are assigned to a "12:1:1" class. Notably, the plaintiff, A.K., is presently also assigned to a
"12:1:1" ratio, towards which the plaintiffs respectfully submit is a self-evident expression that he is essentially
"similarly situate and/or prima facially identical" to the other "alternately assessed students", other than his older
age. And again, the only reason he is the oldest student is because, prior to his lawsuit, the defendant district had
reflexively "outsourced" the educational placement of every single post-elementary aged "alternately assessed
special education student" that had ever come before it.

comprehensive mandates that compelled enrollment, including the vesting educational law

contract, 8 NYCRR 200.2(f), and finally the historic course of dealing fortified between the

Remsenburg-Speonk School District and the defendant district.

125.    Again, the plaintiffs would point out how the plaintiff, A.K., became the only student to

ever have his enrollment denied, predicated upon a disability.

126.    In fact, the plaintiffs submit that the plaintiff, A.K.'s, enrollment was denied, only

because he had vowed to challenge the defendant district's sordid and discriminatory history of

"outsourcing" the post-elementary education of every single post-elementary aged "alternately

assessed special education student" that had ever come before it.

Point IIIB: There is no justification for the defendants' "post enrollment" unequal treatment of
the plaintiff, A.K.

*Point IIIB(i): The defendants cannot justify their "post enrollment" unequal treatment of the
plaintiff, A.K., within the context of the CSE that was convened in October 2016*

127.    IHO Lederman's decision points out how the defendant district continued its "summary

dismissal and/or predetermination" of the plaintiff, A.K., even following his enrollment and

within the context of the CSE convened in October 2016.

128.    In fact, IHO Lederman held that, within the context of such referenced CSE, the

defendant district had dismissed the possibility of educating the plaintiff, A.K., "without even

considering a single piece of paper".

129.    With respect to the foregoing, the plaintiffs submit that the defendant district's "post-

enrollment summary dismissal and predetermination" of the plaintiff, A.K., profiles as yet

another aspect of the unequal treatment imposed upon the plaintiff, A.K.

130.    Specifically, in this regard, the plaintiffs respectfully submit that such "summary dismissal and predetermination" illustrates how the defendants treated the plaintiff unequally to all of the other enrolled students, who presumably were having their respective educational placements afforded "appropriate" administrative due process.

*Point IIIB(ii): The defendants cannot justify their "post enrollment" unequal treatment of the plaintiff, A.K., within the context of choosing to educate certain "alternately assessed special education students", but not the plaintiff, A.K.*

131.    The record reveals that the defendant district does not lack any particular special education resource that would prohibit their ability to educate the plaintiff, A.K.

132.    The only reason ever cited by the defendant district to exclude the plaintiff, A.K., is an alleged lack of students – a factor that not only profiles as being perverse, but also is not a bona-fide educational justification to avoid educating the plaintiff, A.K., and affording him his rights as guaranteed by law.[19]

133.    The plaintiffs respectfully submit that the fact that the defendant district has clearly and self-evidently revealed its capacity to employ its special education resources towards the successful education of post-elementary aged "alternately assessed special education students", as exhibited within the defendant district's existing "alternately assessed special education class", reveals that the defendant district has the self-evident capacity to do so for the plaintiff, A.K.[20]

134.    The plaintiffs respectfully submit that the defendants' refusal to educate the plaintiff, A.K., is illustrative of the unequal treatment being exercised by the defendant district between

---

[19] See FN # 13, herein.
[20] Again, the plaintiffs are unaware of any other public High School that is not educating, or has not educated, post-elementary aged "alternately assessed special education students" at the High School Level.

the plaintiff, A.K., and the "alternately assessed special education students" within the

defendant district's existing "alternately assessed special education class".

*Point IV: The defendants' intransigence is "retaliatory"*

135.    Prior to the plaintiffs' initial lawsuit, the record reveals that the defendant district had

reflexively "outsourced" the post-elementary educational placement of every single

"alternately assessed special education student" that had ever come before it.[21]

136.    Inherently, within its comprehensive litigation filed against the defendant district, the

plaintiffs have directly and indirectly challenged the defendant district's historic and

discriminatory policy of "outsourcing" the post-elementary education of every single

"alternately assessed special education student" that had ever come before it.

137.    The plaintiff, A.K., profiles as the only student to have ever had his/her enrollment

denied by the defendant district, predicated upon a disability.

138.    The plaintiffs herein query upon the Court – "is the Court genuinely prepared to accept

the notion that the denial of the plaintiff, A.K.'s, enrollment was merely a matter coincidence or

alternatively some type of inadvertent and/or innocent administrative gaffe?".

139.    The plaintiffs respectfully submit that the defendants' intransigence, which has been

supported by IHO Lederman's findings, is evidence of the defendants' intent to retaliate upon

the plaintiffs for having the audacity to challenge the defendants' historic, institutionalized, and

discriminatory practice and/or policy of "outsourcing" the post-elementary education of every

---

[21] Again, this sordid reality is not a matter of conjecture or speculation, as such reality has been revealed through
an analysis of the District Census data, as well as from the admissions of the defendant district Superintendent and
the Board of Education Members, Suzanne Mensch and James Hulme.

single post-elementary aged "alternately assessed special education student" that had ever come before it.

*Point V: The defendants' unequal treatment of the plaintiff is not simply illustrative of being a violation of the IDEA, but also remains illustrative of an ADA and 504 claims, and moreover profiles as stark example of the unequal treatment applied to the plaintiff, A.K.*

140.    The defendant district's violation of the IDEA, relative to the 2015-2016 and 2016-2017 academic years, cannot be challenged at this juncture.

141.    Again, the defendant district failed to appeal IHO Lederman's findings in this regard.

142.    The U.S. Courts of Appeal for the Second, Seventh, and Eighth Circuits have allowed 1983 actions to be utilized to remedy a violation of the IDEA. (See: "The Intersection of 42 U.S.C. 1983 and the Individuals With Disabilities Education Act", Fordham Law Review, Volume 76/Issue 6/Article 14, Suzanne Solomon, 2008; see also: Marie O. v. Edgar, 131 F.3d 610, 622 (7th Cir. 1997); Digre vl Roseville Schs. Indep. Dist. No. 623, 841 F.2d 245, 250, 2005 WL 5740024 at *7; Mrs v. Tirozzi, 832 F.2d 748, 755 (2nd Cir 1987).

143.    In fact, the Second, Seventh and Eighth Circuits have held that with the 1986 amendment to the IDEA, Congress intended that IDEA rights be enforceable under 1983. (Id.).

144.    Further, as evidenced by the text, structure, and legislative history of the 1986 amendment to the IDEA, not only did Congress not intend to foreclose avenues to 1983, it actually called for its availability to enforce the IDEA. (Id.; see also: A.W. v. Jersey City Public Schools, 486 F.3d 791, 801 (3rd Cir. 2007) – notes 80-83, 111-112, 136-138 and 223-226.).

145.    The plaintiff respectfully submits that while admittedly there may be some overlap between the plaintiffs' previously sustained IDEA based claims and the plaintiffs' present "1983

26

equal protection – class of one claim", such overlap should not be utilized to nullify the independent merit and nature of the latter.

146.     Further, the plaintiffs note to the Court how the plaintiffs' claim relating to the unequal treatment exhibited upon the plaintiff, A.K., in relation to the defendant district's disparate treatment of the plaintiff, A.K., as compared to the defendant district's treatment of the "alternately assessed special education students" presently being educated within the defendant district's "alternately assessed special education class", remains entirely independent of any IDEA based claim ever asserted by the plaintiff, A.K.

147.     The plaintiffs respectfully submit that the statements set forth herein reveal how the defendants have violated the plaintiff, A.K.'s, "equal protection" rights, as protected by the 14th Amendment of the United States Constitution.

148.     In light of the statements set forth herein, the plaintiffs respectfully submit that they have set forth the necessary elements to support their "1983 equal protection – class of one claim".

149.     Pursuant to the defendants' violations of the IDEA, the ADA, and 504, as well as the defendants' violations of the plaintiff, A.K.'s, constitutional right to equal protection, the plaintiffs submit that they have collectively suffered significant physical, emotional and psychological damages.

        **WHEREFORE**, the plaintiffs respectfully request this Court to issue a declaratory judgment, validating the plaintiffs' "1983 equal protection – class of one claim", and to furthermore schedule an inquest for purposes of discerning an appropriate monetary damage award, as well as any other equitable relief that the Court may deem necessary.

Date: 4/19/21

X. _____
Christian Killoran, Pro-Se, on behalf of the plaintiffs

# VERIFICATION

STATE OF NEW YORK )
                  ) ss:
COUNTY OF SUFFOLK )

      CHRISTIAN KILLORAN, being duly sworn, deposes and says that he is the Plaintiff in the instant

action and has read the foregoing COMPLAINT; deponent knows its content and knows that it is true to

the best of deponent's knowledge, except as to those matters stated to be upon information and belief,

and as to those matters deponent believes them to be true.

                                           CHRISTIAN KILLORAN

Sworn to before me this
19th day of April, 2021.

NOTARY PUBLIC

      ANDREA PITNEY
   Notary Public State of New York
   Suffolk County No. 01PI6044574
   Commission Expires July 10, 20 22

ANDREA PITNEY
Notary Public State of New York
Suffolk County No. 01PI6311574
Commission Expires July 10, 20__

# EXHIBIT P-1

School: Westhampton Beach Middle School
Class/Student Ratio: Special Class 12:1:1
Grade: Ungraded (Chronological age/grade equivalent: 6th & 7th Grade)
Subject (if Departmentalized): English, Math, Reading, Science & Social Studies

| Student | Classification | Age | Full Scale IQ | Reading Level | Math Level | BIP | Aide | Generally Assessed | Alternately Assessed | Verbal/ Nonverbal |
|---------|----------------|-----|---------------|---------------|------------|-----|------|--------------------|----------------------|-------------------|
| 1 | ID | 12 | 64 | Adaptive 56 | NA | No | 2:1 | No | Yes | Verbal |
| 2 | MD | 11 | 61 | Adaptive 59 | NA | No | 1:1 | No | Yes | Nonverbal |
| 3** | Autism | 10 | 69 | 46 | 59 | Yes | 2:1 | No | Yes | Verbal with prompting |

*** Possible student through cross contract. CSE has yet been conducted.*

WESTHAMPTON BEACH UNION FREE SCHOOL DISTRICT
340 MILL ROAD, WESTHAMPTON BEACH, NEW YORK 11978
(631) 288-3800 • Fax (631) 288-5920

JUN 14 2018

Westhampton Beach UFSD
Pupil Personnel Services

**Angela Austin, Ed.D.**
*Director of Pupil Personnel Services*

**Michael R. Radday**
*Superintendent of Schools*

Re: Variance Request

Dear Mr. & Mrs. Killoran:

In consideration of the parents' request that the District petition for a variance to allow their son to be placed within a Middle School 12:1:1 Special Class the below aspects were considered in determining the inappropriateness of submitting such a request. As significant as the exceeding of the 36-month requisite between the youngest and oldest child in the class is the fact that the class as composed of middle school grade while Aiden should be in a High School program placement.

- The ages/DOB of each child recommended for the class:
  - Student 1: 03/27/2006 (12)
  - Student 2: 04/18/2007 (11)

  - *Aiden will be 16 years old on September 7, 2018 (DOB 09/07/2002)*

- Student being considered for placement:
  - Student 3: 7/24/2007 (10) (Possible student through cross contract)

- The number of students in the class; Middle School 12:1:1 Special Class
  - 2 students recommended through CSE as of 6/11/2018; Student 3's CSE is to be conducted shortly.

- The classifications of each of the students in the class:
  - The entire class is structured for alternately assessed students
    - Student 1: Intellectual Disability, Alternately Assessed
    - Student 2: Multiple Disabilities; Alternately Assessed
    - Student 3: Autism, Alternately Assessed

    - Aiden: Intellectual Disability, Alternately Assessed

- The related services needed by each student:
  - Student 1: Intellectual Disability (ID)
    - Speech/Language Therapy: Individual: 1x Weekly for 30 min
      Speech/Language Therapy: Group: 2x Weekly for 30 mins
      Occupational Therapy: Group: 2x Weekly for 30 mins
      Counseling: Group: 1x Weekly for 30 mins
  - Student 2: Related Services
    - Speech/Language Therapy: Individual 1x Weekly for 30 mins
      Occupational Therapy: Small Group 2x Weekly for 30 mins
      Physical Therapy: Small Group 2x Weekly for 40 mins
      Counseling: 1x Group & 1x Individual for 30 minutes
  - Student 3: Autism:

1

- Speech/Language Therapy: Individual: 2x Weekly for 30 min
  Speech/Language Therapy: Group: 1x Weekly for 30 mins
  Counseling: Group: 1x Weekly for 30 mins
  - Aiden:
    - Speech/Language Therapy: Individual 4x Weekly for 30 mins
    - Speech/Language Therapy: Small Group 1x Weekly for 30 mins
    - Special Instruction: Individual 4x Weekly for 1 hr 30 Mins, home
    - Occupational Therapy: Individual 2x Weekly for 30 mins
    - Physical Therapy: Individual 3x Weekly for 30 mins
    - Parent Counseling and Training: Individual 1x Monthly for 1 hr

- The staffing ratio involved:
  - 1 Teacher
  - 1 Class TA
  - Student 2 & Student 3 Have 1:1 aides all day
  - Student 1 has 1:1 Aides for mainstream electives and transitioning in hallway

- The level of participation in regular education by each class member:
  - Students will participate in mainstream electives & lunch with support of class TA and 1:1 aides.
  - Student 1 will participate in general education physical education; the other students have been recommended for adaptive PE.

- A description of the class as to the four areas of learning rate and academic performance; social development; physical development; and management needs:

Description of the 12:1:1 Middle School Special Class:

This program provides a highly structured Middle School Special Class setting for students participating in the New York State Alternative Assessment (NYSAA) and who are working toward a Skills and Achievement Commencement Credential. This program emphasizes skills that will enable the student to develop independence and self-determination. With a curriculum focused on NYS standard based and functional skill-driven academics in reading, writing and math, along with social skills and activities of functional daily living, student's individual abilities, needs and preferences are cultivated.

At the Middle School level, in addition to speech services on the IEP, a speech consult service will be provided in the classroom. With this model, the therapist and the classroom teacher are able to provide whole group instruction, small group and individual instruction, as needed. The amount of student/therapist contact time is increased and the intent is for students to generalize the skills they have learned. Additional time will be allocated for the speech therapist to provide consultation for students who utilize augmentative communication devices. A behavior consultant will be made available to classroom teachers on an as needed basis.

The program does not include the transitional "embeddings" that would be required for a High School student such as Aiden (post-15 years od age).

Students Currently Recommended for the Program:

2

Student 1:

Academic Present Levels:

## Reading:

Student 1 is able to read a variety of functional sight words. Student 1 is able to decode many mulitsyllabic words. At times, Student 1 needs reminders to review vowel sounds. The fundations cards assist the student with these sounds. Student 1 is able to answer basic questions about a text. Student 1 is able to identify the main idea of a text and retell a story with prompting and support. Student 1 uses a graphic organizer and basic questioning to help breakdown the details of each part of the story. Student 1 needs to work on understanding and using higher level vocabulary within a text. Student 1 is encouraged to highlight different vocabulary words in a text and use her computer and/or vocabulary wall for understanding.

## Writing:

Student 1 is able to write about 5 sentences independently. Student 1 needs models to show a well-organized paragraph. Student 1 needs reminders that a paragraph should consist of an opening and closing sentence, as well as, three detailed sentences. Student 1 has progressed in ability to generate ideas in writing more independently. Student 1 has shown progress in writing some sight words and CVC words correctly in assignments. Student 1 needs reminders and cues from the word wall when spelling words with long vowels. Student 1 is able to use temporal words to describe an event with reminders. Student 1 is working on further expanding writing with details. Graphic organizers help Student 1 organize and expand thoughts. Student 1 needs to work on revising writing pieces. Student 1 shows some success with models, examples, graphics organizers and checklists.

## Mathematics:

Student 1 is able to identify coins and their values independently. Student 1 is able to add change up to $1.00. Student 1 is able to add and subtract single digit numbers independently. Student 1 needs prompts and assistance when adding double digit numbers with borrowing. It is helpful to highlight the addition and subtraction symbol. Student 1 often forgets these skills if not reviewed daily. Student 1 benefits from using manipulatives in mathematics. Student 1 has difficulty interpreting data when looking at the tables, charts, and graphs. Student 1 needs to improve the ability to answer questions about a given chart or table. Student 1 is encouraged to highlight key information to help assist them. Student 1 is able to solve multiplication facts by 2's and 5's. Number lines help Student 1 solve multiplication facts.

## Speech/Language:

Student 1 has shown good progress in the area of articulation/intelligible speech. Student 1 has shown growth in ability to correctly produce the /TH/ and /S/ sounds in all positions of words and simple sentences. Student 1 is working on carry over into conversational speech. Student 1 is making and effort and improving at making speech more intelligible. Student 1 has become more talkative and has been observed asking and answering questions with adults and peers on a regular basis. At times, spoken words are hard to hear. Student 1 is always encouraged to take chances and speak using a louder voice during conversations. A pacing board is used help Student 1 practice speaking at a slower pace so

3

that others can understand her. During conversational speech with minimal prompting, Student 1 is able to maintain eye contact, greet and initiate a conversation, and demonstrate appropriate topic maintenance by asking/answering questions and making comments for two minutes. Student 1 needs to further develop and improve her expressive and receptive language skills including grammar, syntax, and pragmatic language.

**Study Skills:**

Student 1 has materials needed for assignments.
Student 1 needs extra time to complete class assignments.
Student 1 performs assignments with assistance.
Student 1 needs prompting and supporting to follow single and multi-step directions.

**Academic Need:**

Student 1 needs to work on understanding and using higher level vocabulary within a text. Student 1 needs to work on following oral and written directions in sequence to complete a task. Student 1 needs to improve the ability to analyze and interpret data when looking at charts and/or tables. Student 1 needs to work on revising and editing writing pieces. Student 1 needs to improve expressive and receptive language skills.

**Social Development:**

Student 1 is a nice child. Student 1 is kind to peers and has nice manners. Student 1 is able to work cooperatively with peers.

**Social Need:**

Student 1 needs to initiate and ask questions to other students. Needs to expand conversations with peers and adults

**Physical Levels:**

Student 1 presents with delayed visual motor integration and visual perceptual skills hindering written communication in the school environment. Student 1 presents with ocular motor challenges hindering ability to accurately and efficiently track visual information while reading, writing, and copying from near and far point distances.

**Physical Needs:**

Student 1 needs to improve visual motor integration and visual perceptual skills for improved handwriting legibility. Student 1 needs to improve ocular motor skills for improved near and far point copying while note taking in the classroom environment.

**Management Needs:**

Student 1 has significant delays and requires a small teacher-to-student ratio program with minimal distractions in order to academically progress. Student 1 benefits from teacher re-direction to stay on task. Student 1 needs visuals to support multi-step directions. Student 1 benefits from having larger assignments broken down into smaller parts. Student 1 needs to ask for help when needed. Student 1 benefits from a checklist to help pack up for the day.

4

Student 2:
**Academic Present Levels:**

**Reading:** Student 2 is able to identify all letters of the alphabet. Student 2 is able to identify some sight words and CVC words through choice. Student 2 is able to answer questions about a text through choice. It is difficult to assess Student 2 the area of reading due to lack of speech in school. Student 2 currently identifies words, sounds, and answers questions through choice. At times, Student 2 will write a one-word answer to a response on a whiteboard. Student 2 is currently identified as selectively mute in the school setting. Student 2 communicates with peers and staff through gestures, visuals, pictures and written words.

**Writing:** Student 2 is able to write CVC word independently. Student 2 is able to write one sentence independently. Student 2 needs assistance with providing ideas in writing. Student 2 is provided with pictures, word cards and choice to help generate ideas. Student 2 needs assistance writing more than one sentence. Student 2 is encouraged to use the word wall and fundation cards to assist with sounding out words and identifying sight words

**Mathematics:** Student 2 is able to use one to one correspondence to consistently count to 20. Student 2 is able to add up to 20 with slight assistance. Student 2 needs support when solving word problems. Student 2 is encouraged to highlight key words to identify which operation to use. Student 2 needs to work on telling time to the half-hour. Student 2 is given visuals to assist in differentiating the hour and minute hand.

**Speech/Language:** When presented with a text read aloud, Student 2 is able to answer basic WH questions. Student 2 is learning to identify key information from a given text and highlight these important details to aid in comprehension. With assistance, Student 2 is able to refer back to the text and locate highlighted information to answer comprehension questions. With prompting, Student 2 can recall and comprehend events from a paragraph with 70% accuracy. To communicate wants and needs in school, Student 2 signals with a "thumbs up, thumbs down" method of communication. Occasionally, Student 2 will use picture symbols to interact with adults and peers in the classroom. Student 2 does not spontaneously use this form of communication to request things, greet peers, or during lessons or classroom activities. In speech, Student 2 utilizes the iPad and is beginning to navigate the Proloquo app to communicate. This is used to answer basic questions, identify Student 2's feelings, greet peers and adults, and request things. Student 2 shows little or no motivation to speak in school. Student 2 does not take the initiative to greet other children in the hallway and needs constant reminders and prompts to use manners.

**Academic Needs:**

Student 2 needs to improve ability to write more than one sentence about a topic.
Student 2 needs to understand basic word problems in mathematics.
Student 2 needs to improve ability to tell time to the half-hour.
Student 2 needs to hand in completed assignments consistently on time.
Student 2 needs to express needs and wants more effectively.
Student 2 needs to learn how to communicate effectively in social situations.
Student 2 needs to improve communication and language skills by using an augmentative communication device in his educational environment.

5

**Social Present Levels:** Student 2 has severe problems relating appropriately to adults and/ or peers. Student 2 often does not participate in small structured groups. Student 2 has limited interactions with other children. Student 2 is unable to communicate effectively in social situations. Student 2 enjoys interacting with familiar adults and peers. Student 2 is shy, especially with new people or in large groups. Student 2 has been diagnosed with Selective Mutism. Student 2 displays anxiety regarding speaking or making noise in the classroom (e.g., will muffle coughing and refrain from laughing audibly, will very quietly open a bag of chips). Through planned classroom activities, Student 2 seems more comfortable making noises that do not involve his voice (e.g., crumbling up paper, blowing through straws). In individual counseling, Student 2 will move mouth to imitate different sounds and will blow air from behind a piece of paper. Student 2 responds well to prompts to use big gestures (e.g., sign for thank you, waving, raising his hand, thumbs up, nodding/shaking head, pointing), as Student 2 is often initially reluctant to do so. During individual counseling, Student 2 has indicated a desire to increase communication at school. Student 2 consistently wants to share progress in counseling with his 1:1 aide and teacher.

**Social Needs:** Student 2 requires adult support and guidance in social situations. Student 2 must develop appropriate nonverbal social skills for communication such as greeting others and using nice manners. Student 2 needs to improve ability to cope with anxiety.

**Physical Present Levels:** Student 2 uses a wheelchair as main mode of mobility, requires minimal to moderate assist during transfers using a transfer board. Student 2 demonstrates limitations/contractures in range of motion in the lower extremities and presents with deficits in strength, endurance, balance, bilateral coordination and motor planning. Motor planning difficulties are more apparent when Student 2 is presented with a new activity. Student 2 demonstrates inadequacies in eye-hand coordination. Student 2's ability to copy text from both a near and far point distance is significantly hindered by ocular motor delays. Student 2 demonstrates significant delays in his ability to visually track text while copying from near and far point distances. Student 2 presents with upper extremity low muscle tone and decreased strength hindering ability to maintain prolonged endurance while engaged in fine motor and graphomotor activities. Student 2 fatigues easily while manipulating classroom tools such as a pencil, crayon, and scissor affecting ability to accurately and efficiently complete paper and pencil tasks in the classroom. Student 2 presents with significant delays in visual motor integration skills hindering ability to accurately copy developmentally challenging shapes, letters and numbers. Student 2 presents with significant delays in visual perceptual skills. Student 2 demonstrated significant inability to discriminate perceptual information accurately. Student 2 has been diagnosed with spina bifida, kidney disease, bilateral club feet, scoliosis, and a seizure disorder (for which is prescribed medication and has a shunt). Student 2 is paralyzed from the waist down. Student 2 requires catheterization by the school nurse every four hours (typically once during the school day). Student 2 requires frequent prompting to make sure drinks enough water. Student 2 wears glasses throughout the school day.

**Physical Needs:** Student 2 needs to improve in ability to self-propel the wheelchair indoors and outdoors; and be independent in transfers. Student 2 needs to improve in strength, endurance, balance, bilateral coordination and motor planning. Student 2 needs to improve in eye-hand coordination skills to improve ball playing skills. Student 2 needs to improve upper extremity strength and muscle tone for improved endurance during fine motor and graphomotor activities. Student 2 needs to improve visual motor integration for improved graphomotor skills in the classroom environment. Student 2 needs to improve visual perceptual skills for improved writing legibility and understanding of perceptual information while engaged

6

in graphomotor activities.  Student 2 needs to improve ocular motor skills for efficient visual tracking while engaged in reading, writing and copying activities in the classroom environment.

**Management Needs:**

      Student 2 requires moderate supervision to function in the educational setting.
      Student 2 needs to learn to stay on task without assistance.
      Student 2 requires a reward system for completing tasks.
      Student 2 needs to seek help when needed.
      Student 2 has significant delays and requires a small teacher-to-student ratio program with minimal distractions in order to academically progress.
      Student 2 requires catheterization by the school nurse every four hours (typically once during the school day). Student 2 requires frequent prompting to make sure he drinks enough water.
      Student 2 generally needs prompting to use adequate nonverbal communication (e.g., to make bigger gestures, to point clearly to a picture).

**Student 3:**   CSE has yet been conducted.

*Aiden's Present Levels as to the above criteria:*

**Academic Present Levels:**

**Speech/Language:**

- Aiden communicates his wants and needs verbally. Aiden presents with speech dysfluency during spontaneous speech. Aiden requires extended wait time to process spoken information and formulate verbal responses. Aiden produces sentences of varying length when communicating his wants and needs. However, sentence starters are provided to assist Aiden in formulating responses to direct questioning. Aiden's speech production errors are consistent with oral motor features related to Down's Syndrome.

**Reading:**

- Aiden is motivated to respond to text.  Aiden regards ending punctuation markers while reading aloud.  Aiden is able to decode words up to three syllables.

- Aiden has made progress towards his reading goals. He is motivated to read. Aiden enjoys various types of text including poetry, fiction, and nonfiction literature. While reading, Aiden regards punctuation. He is able to identify different types of punctuation and can be prompted to read with inflection. Aiden is able to decode multiple syllable words Aiden has basic vocabulary knowledge and is motivated to learn new words and their meaning.

**Writing:**

- Aiden is able to capitalize letters, space between words and punctuate sentences when copying text in a text-speech word processor.  Aiden is familiar with the standard keyboard layout.

- Aiden is currently using an iPad to provide written responses to comprehension questions. He is using the device to write reports that consist of at least 6 sentences about

a personal experience, a historic event, holiday, a person of importance in history, and pieces of literature. Aiden is using punctuation and capitalization and is able to go back and edit his work.

## Mathematics:

- Aiden is able to identify pennies, nickels, dimes, and quarters and recall their values with fair consistency. Aiden is able to use kinesthetic strategies to solve addition problems up to 20 with some guidance. Aiden is able to count manipulatives up to 30 with minimal prompting.

- Aiden is able to solve simple addition and subtraction equations using manipulatives. Aiden is a visual kinesthetic learner and benefits from visual aides to complete word problems. When completing word problems, Aiden benefits from breaking down a problem into simple steps. Aiden is using visuals to understand the concept of more and less. He is applying mathematics skills to measurement in inches and degrees. He is also using measurement when completing recipes.

## Basic Cognitive/Daily Living Skills:

- Aiden will initiate and complete routines to take care of his academic materials with visual and verbal prompting.

- Aiden enjoys a structured routine and will use a list (either digital or written) to make a plan for his day. He is able to identify the date and weather. He is able to choose appropriate clothing and outerwear based on the outdoor temperature and weather. Aiden is able to prepare the materials required for him to be ready for school and places items where they belong upon returning home. With supervision, Aiden is able to complete recipes and enjoys preparing his lunch and snacks. Aiden visits the local library and enjoys taking out books and participating in library programs. Aiden is able to carry on a conversation with verbal prompting or a sentence starter. Aiden is able to participate in games that require turn taking and responds appropriately to winning and losing.

## Other:

- Learning Style: Aiden requires rote practice and/or written scripts to follow directions and complete routines. Aiden learns by observing and interacting with typical peers accompanied by prompting. Aiden utilizes kinesthetic, visual and physical prompt to respond to spoken language, routines and manage through his day. Aiden utilizes an assistive device iPad applications for calendar/task list to complete routines. Aiden is a visual processor.

## Academic Needs & Parent Concerns:

Aiden presents with difficulty with comprehension/use of linguistic concepts, answering questions, and following multiple-step directions. He does not clarify a message when he is not understood. He does not ask for help, information, or clarification. A 7-second delay is noted when answering questions.
Aiden exhibits phonological delays and dysfluent speech production.
Aiden needs to count out multi-valued coins and bills.
Aiden needs to apply quantitative concepts for measurement and time tasks and managing

money.
Aiden needs to read text and respond to questions and procedures.
Aiden needs to copy text using correct paragraphs, spacing, and possessive markers without prompting.
Aiden needs to write a list using a device of his daily schedule of activities or classes.
Aiden needs to write written text with missing punctuation or punctuation errors.
Aiden needs to place capitals, commas, periods and question marks.
Aiden needs to count groups of objects and tell which group contains more or less.
Aiden needs to write a complete sentence that describes a picture.
Aiden needs to verbally state, or use a device to share, his address and phone number
Aiden requires occasional verbal prompting & assistance with outer wear
Aiden requires an Aide for bus/hallway navigation
Aiden requires aide assistance within mainstream settings/classes
Aiden needs to improve his comprehension skills in regards to responding to text.
Aiden needs to reduce the number of verbal prompts given when responding to comprehension questions.
Aiden needs to be able to collect simple data.
Aiden needs to be able to display collected data.

**Speech/Language Needs:**
Aiden needs to improve his fluency during conversational speech which impacts his overall intelligibility. He needs to increase his auditory comprehension and retention of information presented orally. Aiden needs to improve his syntax and grammar when formulating complete sentences. Aiden needs to improve his ability to use descriptive language to improve his specificity and overall sentence quality.

**The parents have identified and expressed the following concerns:**

Aiden needs to be in the least restrictive learning environment, since 2004
Aiden needs a challenging specially designed modified curriculum with use of the continuum of services
Aiden needs to be around his familiar typically developing peers during academic and nonacademic and extracurricular activities all within his community
Aiden needs to ride the bus alongside his familiar typically developing peers to continue his education and training on his community roads and the route to school daily
Aiden needs assistive technology
Aiden needs to attend the WHB School and learn to navigate the hallways and use his locker alongside his familiar typically developing peers
Aiden needs the utmost challenging academic and non-academic standards alongside his typically developing peers
Aiden needs to have access to his typically developing peers during lunch and non-academic areas
Needs to maintain existing community relationships to meet transitional goals
Need to have the IEP aligned with curriculum standards.

**Social Present Levels:** Aiden is social with both peers and adults. He seeks social opportunities and attempts to engage others in all situations. Aiden appears confident. He adjusts as necessary to changes in environment.

**Parents have shared the following:**
- Aiden is highly social with both familiar peers and adults
- He seeks social opportunities and attempts to engage others in all situations

9

- Aiden appears confident
- Aiden wants to be part of school related activities.
- Aiden enjoys being part of a team and wants to join the Football Team, Basketball Team, LAX Team
- Aiden wants to be part of the WHB fundraising team for all his sports teams
- Aiden can adjust as necessary to changes in environment
- Aiden demonstrates a sense of pride when he recognizes that he has achieved a goal. He compliments himself
- Aiden enjoys joining in with both familiar peers and adults by laughing along during humorous situations
- Aiden is social and likes to interact with his familiar peers and adults

## Social Needs & Parent Concerns:

Aiden exhibits some unrelated and/or perseverative speech and requires prompting to respond appropriately to social conversation.

## Physical Development:

Aiden presents with forward flexion of the upper trunk and neck region and with increased low back extension/lumbar lordosis while in a standing position/during gait activities on level surfaces with kinesiology tape applied along the paraspinal muscles bilaterally as a tactile prompt toward improved alignment while in upright/functional positions and engaged in academic activities. Aiden walks with initiation of lateral weight shift, initiation of functional hip flexion, and initiation of bilateral heelstrike with ankle dorsiflexion observed bilaterally in response to verbal cueing with occasional visual prompt also offered. Aiden has difficulties negotiating the school environment independently due to limitations in motor planning, processing and attention span. Aiden demonstrates deficits in tone, strength and endurance which affects his proximal control and rate of distal fast motion skills. Aiden demonstrates slow balance responses and difficulties in bilateral coordination especially when presented with new activities and settings. Aiden demonstrates deficits in his agility, fast moving skills and delayed gross motor skills due to inadequate balance, bilateral coordination, motor planning, slow processing and limited endurance. Aiden demonstrates deficits in his eye-hand/eye-foot coordination which limits his ball playing skills. Aiden presents with upper extremity low muscle tone and decreased strength hindering his ability to maintain prolonged endurance while engaged in fine motor and graphomotor activities. Aiden fatigues after prolonged manipulation of classroom tools such as a pencil, crayon, and scissor affecting his ability to accurately and efficiently complete paper and pencil tasks in the classroom. Aiden presents with delayed visual motor integration skills hindering his ability to accurately copy developmentally challenging shapes, letters and numbers. These skills are necessary components for efficiently and accurately completing graphomotor tasks such as handwriting in the classroom environment. Aiden presents with ocular motor challenges hindering his ability to accurately and efficiently track visual information while reading, writing, and copying from near point distances.

## Family shared:

- Aiden has a medical diagnosis with binocular conversion efficiency since 2011 that affects his accuracy and efficiency to track visual information while reading, writing and copying information from near and far points.
- Aiden has a medical diagnosis of Down Syndrome which has an impact on his motor and sensory development and performance in the education environment.
- Aiden has a medical diagnosis of Alopecia which is an Autoimmune Disorder and when it flairs up it can affect his energy level which in turn can affect his learning.

10

**Physical Needs:** Aiden needs to improve the alignment of his trunk and extremities. Aiden needs to improve his ability to ambulate in his educational environment with consistent gait pattern - with functional bilateral heelstrike/ankle dorsiflexion during the initial stance phase of gait and with functional levels of hip/knee flexion during the stride phase of gait. Aiden may need to be prompted to clear his food from his mouth (visual or verbal prompt). Aiden needs to improve in his ability to negotiate independently the school environment. Aiden needs to improve in his strength and endurance to improve his agility and performance of fast moving activities. Aiden needs to improve in his balance, bilateral coordination, motor planning and endurance to improve his agility and performance of gross motor skills. Aiden needs to improve in his eye-hand/eye-foot coordination to assist him in all ball playing activities and Adaptive PE class. Aiden needs to improve fine motor strength and endurance for improved manipulation of classroom tools. Aiden needs to improve visual motor integration for improved eye hand coordination and motor accuracy while engaged in graphomotor skills in the classroom environment. Aiden needs to improve ocular motor skills for improved visual scanning efficiency while reading, writing and copying from near point distances.

**Parents shared/expressed the following concerns:**
-Aiden needs a Consultant who is knowledgeable and experienced with students with Down Syndrome to educate the Physical therapist on his disability and aid in his Physical Development Needs
-Aiden need to participate in Physical Therapy for his physical development progress
-Aiden needs to participate in Adaptive Physical Education
-Aiden needs to participate in General Education Physical Education alongside his familiar typically developing peers when applicable
-Aiden needs to strengthen his ocular motor skills to improve academic skills since 2007
-Aiden needs to strengthen his core muscles
-Aiden needs to improve in his ability to negotiate independently the school environment.

**Management Needs:**
Aiden benefits from an established and predictable routine.
Aiden requires a structured environment.
Aiden benefits from individualized attention to focus on tasks.
Aiden needs a 1:1 aide within the educational environment.
Aiden may needs teacher redirection or prompting to stay on task.
Aiden needs a modified curriculum

**Alternative options if variance not viable:**

Cross-Contracting with Public School District:

- Committee recommendation at annual review was the High School 12:1:1 special class program at the Middle Country Central School District.
- Aiden should be placed for the sake of his own benefit with students within an age range of 3 years that will be also working on transitional skills as part of the program.

A viable plan of correction for the ensuing school year would entail:

- Each school year the Westhampton Beach School District reviews current enrollment and student needs to determine the appropriateness of opening classes or amending current programs.

11

There are no educational justifications for a variance:

- The students scheduled for the 6th/7th grade Middle School 12:1:1 Special Class will **not** have the <u>transition</u> focus that a high school 12:1:1 class must have as per regulations.
  - According to NYS Transition Planning and Services for students with Disabilities: Measurable post-secondary goals, imbedded transition actives and recommendations for transition services and activities must be included in each student's IEP beginning not later than the first IEP to be in effect when the student is age 15.
- The age span for the class would not be appropriate with 10/11-year-old students and a 16-year-old student in the same class; such adversely impacting the necessary attention to the social and emotional needs of Aiden as well as the other students.

Other students in the grouping would suffer in receiving appropriate educational programs and services meeting their educational needs if the subject variance was to be implemented:

- Mixing 10/11-year-old children with a child of 16 (a variance of some 6 years) raises concerns about quality of instruction when state mandates are distinct. Transition planning mandates make curriculum and embedded activities vastly different in a Middle School and High School program.
- The social and emotional needs of the vast age span would hinder education as well as impacting the capacity to attend to the social and emotional needs of each of the students.

Accordingly, a "variance will not be requested, primarily, due to the extreme age discrepancy of the proposed class students; that discrepancy generates all of the above issues including the state mandates of imbedded transition that is not part of the design of the Middle School 12:1:1 model; in turn it would create a dysfunctional class for all of the students.

The district cannot support a variance petition considering all of the above cited dislocations that would inure if the class composition were to include Aiden. The proposed High School program for alternately assessed students within Middle Country School District is the one that can more appropriately educate Aiden while not adversely impacting the remaining students in the class.

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X
CHRISTIAN KILLORAN, ON BEHALF OF HIS SON,
A.K., CHRISTIAN KILLORAN and TERRIE KILLORAN

        Plaintiffs,

    -against-

WESTHAMPTON BEACH SCHOOL DISTRICT,
MICHAEL RADDAY, as Superintendent, SUZANNE
M. MENSCH, JAMES HULME, JOYCE C. DONNESON,
GEORGE R. KAST, JR., and HALSEY C. STEVENS, as
Board of Education Members,

        Defendants.
_____X

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                )ss.:
COUNTY OF SUFFOLK    )

    The undersigned, being duly sworn, deposes and says:

    That on April 20, 2021, deponent served a true copy of the within AMENDED COMPLAINT, upon

the Defendants, WESTHAMPTON BEACH SCHOOL DISTRICT, by personally delivering same via drop

box at 340 Mill Road, Westhampton Beach, New York 11978 and upon DEVITT, SPELLMAN, BARRETT,

Attorneys for Defendants, 50 Route 111, Smithtown, New York 11787 and ANNE LEAHY LAW, PLLC,

Attorney for Defendants, 17 Dumplin Hill Lane, Huntington, New York 11743 via first class mail, deposited

in a mail receptacle maintained by the United States Postal Service.

                                   _____
                                   ANDREA SICILIANO

Sworn to before me this
20th day of April, 2021.

_____
Notary Public

CHRISTIAN D. KILLORAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02KI6259461
Qualified In Suffolk County
Commission Expires April 9, 20 24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____X

CHRISTIAN KILLORAN, on behalf of his son, A.K.,
CHRISTIAN KILLORAN and TERRIE KILLORAN,

                    Plaintiffs,

          v.                                                    Docket No: 19-cv-6663 (JS)(SIL)

WESTHAMPTON BEACH SCHOOL DISTRICT,
MICHAEL RADDAY, as Superintendent, SUZANNE
M. MENSCH, JAMES HULME, JOYCE C. DONNESON,
GEORGE R. KAST JR., and HALSEY C. STEVENS, as
Board of Education Members,

                    Defendants.

_____X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   APR 2 2 2021   ★

LONG ISLAND OFFICE

## AMENDED COMPLAINT

Dated: Westhampton Beach, New York
          April 19 2021

                              CHRISTIAN KILLORAN, PLAINTIFF

                              By: _____
                              132-13 Main Street
                              Westhampton Beach, NY 11978
                              (631)878-8757

### Certification pursuant to 22 NYCRR 130-1.1(a)

It is hereby certified that, to the best of the undersigned's knowledge, information and belief,
formed after an inquiry reasonable under the circumstances, the presentation of the paper
and/or the contentions herein are not frivolous as defined in section 130-1.1(c).


_____                              _____
Dated                                                         CHRISTIAN KILLORAN, ESQ.

132-13 Main St
Westhampton Beach NY 11978

NEOPOST

$008.85⁰
04/20/2021 ZIP 11978
042L14820399

US POSTAGE

7019 0700 0001 7020 0538

RECEIVED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 22 2021 ★

LONG ISLAND OFFICE

U.S.M.S.

United States District Court
100 Federal Plaza
Central Islip NY 11722
Attn: Honorable Justice Joanna Seybert

4/20